# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# CHATTANOOGA DIVISION

| | | |
|---|---|---|
| **LINDSAY ANN SEXTON** and **CHEYENNE TANTIHACHAI**, as Co-administrators and Personal Representatives of the Estate of Decedent **CHRISTOPHER DALTON SEXTON**, | ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | NO. 1:18-CV-17 REEVES/STEGER |
| v. | ) ) | |
| **HAMILTON COUNTY GOVERNMENT**, | ) ) | |
| **SPENCER DANIELS, BLAKE KILPATRICK, DUSTIN BOWES, RICHARD A. PATTERSON, BREVIN CAMERON, CHRISTOPHER WALKER,** in their individual capacities and their official capacities as agents of Hamilton County Government, and | ) ) ) ) ) ) ) ) ) | |
| **UNKNOWN NUMBERS OF JOHN DOES**, in their individual capacities and their official capacities as agents of Hamilton County Government, | ) ) ) ) ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Following the tragic death of Christopher Dalton Sexton, the co-administrators and personal representatives of his estate have pursued this civil rights case against Hamilton County Sheriff's Office employees Lieutenant Spencer Daniels, Detective Blake Kilpatrick, Deputy Dustin Bowes, Detective Richard A. Patterson, Deputy Brevin Cameron, and Deputy Christopher Walker in their individual and official capacities (the "Individual Defendants"), Hamilton County, and an unknown number of John Does in their individual and official capacities (the "Doe Defendants").

1

Before the Court are three motions for summary judgment, filed by the Individual Defendants [D. 61], Hamilton County [D. 70], and on behalf of the Doe Defendants [D. 72]. Plaintiffs have not responded to any of the motions. As follows, all three motions will be granted.

## I.     Background

### A. Relevant Facts

On January 17, 2017, Plaintiff Lindsay Sexton and the Deceased appeared in Hamilton County Circuit Court regarding a Petition for a protective order brought by Lindsay Sexton. [D. 74-23, PageID # 980–81].[1] At the courthouse, the Deceased was served with Lindsay Sexton's divorce complaint. [*Id.*]. Upon leaving the courthouse, the Deceased called Lindsay Sexton repeatedly and went to the home where she was residing with their child, all in violation of the protective order. [*Id.* at 982]. Lindsay Sexton called the Hamilton County Sheriff's Office and requested assistance. [*Id.* at 982–83; D. 74-19, PageID # 939]. Upon the officers' arrival at the residence, the Deceased fled. [D. 74-23, PageID # 983; D. 74-19, PageID # 939]. Officers were informed that the Deceased was armed and possibly suicidal. [D. 74-19, PageID # 942; D. 74-23, Page ID # 986.4; D. 74-20, PageID # 954].

Eventually, the officers' pursuit of the Deceased became an hours-long vehicular chase through Chattanooga, Red Bank, Signal Mountain, Soddy Daisy, and various unincorporated areas of Hamilton and Sequatchie counties. [D. 74-19, PageID # 939–41; D. 74-20, PageID # 955]. At times, the chase exceeded 100 miles per hour and officers were unable to negotiate a surrender plan with the Deceased. To end the chase, law enforcement officers chose to "spike" the tires of the Deceased's vehicle, which was accomplished after several attempts near the Hixon Pike exit

---

[1] For ease of reference, the Court will cite to the ECF-generated PageID number, rather than internal citations. Moreover, several exhibits, depositions, and affidavits appear in multiple filings, but the Court will refer to only one copy.

of Highway 27. [D. 74-2, PageID # 544; D. 74-19, PageID # 942]. However, the Deceased continued driving on flattened rear tires, taking the Sequoyah Access Road exit. [D. 74-19, PageID # 942]. Deputy Cameron performed a "forcible stop" maneuver, bringing the car chase to an end. [D. 74-19, PageID # 942–44].

The Deceased emerged from his vehicle holding a Glock .357 automatic pistol to his head with his right hand. [D. 74-18, PageID # 927; D. 74-19 PageID # 949]. Several officers exited their vehicles behind the Deceased's stopped vehicle, and the Deceased began to walk away from the officers with his gun still to his head. [D. 74-18, PageID # 927; 74-19 PageID # 949]. Deputy Cameron approached the Deceased, discouraging him from continuing to approach a populated area, and Deputies Patterson, Bowes, and Walker formed a line to the right of Deputy Cameron, all with weapons drawn. [D. 74-19, PageID # 945; D. 74-22 PageID # 971–72]. Deputy Cameron repeatedly ordered the Deceased to drop his weapon, as did other officers. [D. 74-19, PageID # 950]. The Deceased lowered his pistol from his head while turning, causing the gun to "break" Deputy Cameron's "silhouette" and point at Deputy Cameron's body. [*Id.*; D. 74-22, PageID # 974; D. 74-18, PageID # 930–31; D. 74-24, PageID # 1009]. Immediately, Officers Cameron, Walker, Bowes, and Patterson all fired at the Deceased. [D. 74-19, PageID # 950, D. 74-24, PageID # 1010-11, D. 74-22, PageID # 974, D. 74-18, PageID # 932]. At some point during these events, the Deceased fired one round from his pistol. [D. 66-1, PageID # 343–45]. At the time of the shooting, Soddy Daisy Officer Marty Penny and Red Bank Officer Matt Goins arrived on the scene. [D. 74-8, PageID # 775–76; D. 74-4, PageID # 760–61].

The Deceased, still alive at this point, lifted his chest and reached for his dropped pistol with his right hand. [D. 74-8, PageID # 775–76; D. 74-4, PageID # 760–61; D. 74-19, PageID # 950–51, D. 74-24, PageID # 1011–12, D. 74-22, PageID # 974–75, D. 74-18, PageID # 932–33].

3

Officers Kilpatrick and Daniels, armed with a SWAT rifle and pistol, respectively, approached the scene. [D. 74-21, PageID # 964; D. 74-20, PageID # 959]. Officer Penny, observing the Deceased's movements, shouted "don't do it" and other officers began shouting to acknowledge the Deceased's movement. [D. 74-8, PageID # 775–76]. All eight officers on the scene perceived a continuing threat. [D. 74-19, PageID # 950–51, D. 74-24, PageID # 1011–12, D. 74-22, PageID # 974–75, D. 74-18, PageID # 932–33; D. 74-21, PageID # 964; D. 74-20, PageID # 959; D. 74-8, PageID # 775–76; D. 74-4, PageID # 760–61]. Officers Kilpatrick and Daniels then fired one round each at the Deceased. D. 74-21, PageID # 964–65; D. 74-20, PageID # 959–60; D. 74-24, PageID # 29–30]. He was pronounced dead on the scene.

Following the shooting, the Tennessee Bureau of Investigation investigated the scene and performed subsequent forensics analysis on the evidence collected. [D. 66-1, PageID # 281–353]. The TBI determined that the officers fired a collective total of 49 rounds, based on the number of matching cartridges found and examination of the officers' weapons. [*Id.* at 340–53]. Upon the completion of the TBI investigation, the findings were reported to the District Attorney General of Hamilton County, Neal Pinkston, who chose not to pursue criminal charges against the officers following the shooting. [D. 74-2].

Hamilton County Medical Examiner Dr. James Metcalfe performed an autopsy on the Deceased. [D. 74-2, PageID # 571]. Dr. Metcalfe determined that the Deceased was struck by fifteen rounds, and eleven bullets or bullet fragments were recovered from the Deceased's bullet wounds. [*Id.*]. Dr. Metcalfe concluded that five of the wounds could have been fatal. *Id.*

### B. Procedural History

On January 18, 2018, Ashley Sexton, the Deceased's sister, filed suit in the Circuit Court for Hamilton County as the Executrix and Personal Representative of the Deceased's estate. [D.

1-1]. Hamilton County and the Individual Defendants removed the case to this Court on January 26, 2018. [D. 1]. However, issues arose as to whether the Deceased left a valid will or died intestate, making it unclear whether Ashley Sexton had standing to assert a claim on her own behalf or on behalf of the Deceased's estate. [D. 25]. Ashley Sexton was removed as the executrix and personal representative of the Deceased's estate, and Lindsay Sexton and Cheyenne Tantihachai[2] were appointed as co-administrators of the Deceased's estate by the Chancery Court of Hamilton County. [D. 44]. Consequently, by agreement, Lindsay Sexton, and Cheyenne Tantihachai were substituted in this case as the named plaintiffs as instead of Ashley Sexton. [D. 44]. Thereafter, discovery in the case continued.

On January 31, 2020, the Individual Defendants filed their motion for summary judgment and several affidavits in support. [D. 61, 62–69]. On February 1, 2020 Hamilton County and the Doe Defendants also filed motions for summary judgment, along with a joint statement of material facts. [D. 70, 72, 74]. On February 21, 2020, counsel for Plaintiff Tantihachai filed a motion for an extension of time to respond to the three motions for summary judgment [D. 78], which the Court granted. [D. 79]. A day later, Plaintiff Sexton requested an extension [D. 80], which the Court also granted. [D. 83]. On March 6, 2020, counsel for Plaintiff Tantihachai contemporaneously filed a second motion for an extension to file a response [D. 84], a motion to compel mediation [D. 85], and a motion to withdraw as counsel [D. 86]. Undergirding the delay and counsel's motion to withdraw was Plaintiff Tantihachai's unresponsiveness to her attorney. The Court held the second extension and mediation motions in abeyance pending resolution of the motion to withdraw. [D. 91]. Following a hearing, counsel for Tantihachai was permitted to withdraw, and Tantihachai was ordered to secure new counsel or proceed *pro se*. [D. 93]. In light

---

[2] Documents filed with the Court reflect varying spellings of the names of the two named plaintiffs. The Court has elected to use the spellings adopted by their own counsel.

5

of counsel's withdrawal, the Court continued the trial date indefinitely, denied the motions for a second extension and mediation, and ordered Plaintiffs to show cause why the motions for summary judgment should not be granted and the case dismissed for failure to prosecute. [D. 95]. On June 15, 2020, counsel for Lindsay Sexton responded to the Court's Show Cause Order, indicating that an expert could not be retained to rebut the motions and no cause could be shown. [D. 96]. Plaintiff Tantihachai did not timely respond. The motions for summary judgment are now ripe for adjudication.

## II. Legal Standards

Federal Rule of Civil Procedure 56 is an integral tool for securing the "just, speedy[,] and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The moving party is entitled to judgment as a matter of law "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of truth at trial." *Id.* at 322. Accordingly, the moving party bears the burden of establishing that no genuine issues of material fact exist. *Id* at 330 n. 2; *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be

6

material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

However, even when a movant's evidence has not been addressed by the adverse party, a district court cannot grant summary judgment simply because the adverse party has not responded. *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998). Rather, a court is required to, at a minimum, examine the motion to ensure that the movant has met its initial burden. *Id.* In doing so, the court "must not overlook the possibility of evidentiary misstatements presented by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 407 (6th Cir. 1992). The court must "intelligently and carefully review the legitimacy of [ ] an unresponded-to motion, even as it refrains from actively pursuing advocacy or inventing the *riposte* for a silent party." *Id.* Nevertheless, the Court will not "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Id.* at 410. If the court determines that the unrebutted evidence set forth by the moving party supports a conclusion that there is no genuine issue of material fact, the court will determine that the moving party has carried its burden, and "judgment shall be rendered forthwith." *Id.* (alteration omitted); *see, e.g.*, *Hatley v. Simerly*, No. 2:14-CV-326-JRG-DHI, 2017 WL 2023721, at *2 (E.D. Tenn. May 11, 2017).

### III. Analysis

Despite extensions of time to respond, Plaintiffs have not responded to any of the motions for summary judgment before the Court. Consequently, the Court will examine each motion to discern whether each movant has met its initial burden. The Court will address the motions for summary judgment in the sequence that they were filed, starting with the Individual Defendants' motion for summary judgment.

7

## A. Individual Defendants' Motion for Summary Judgment

The Individual Defendants have moved for summary judgment, arguing that qualified immunity and the statute of limitations forecloses Plaintiffs' claim under 42 U.S.C. § 1983, immunity forecloses any damages arising from Plaintiffs' claims for negligence and wrongful death under Tennessee state law, and failure to establish the necessary legal elements forecloses Plaintiffs' claims of assault, battery, and intentional infliction of emotional distress under Tennessee state law.

### 1. 42 U.S.C. § 1983

Plaintiffs' have sued the Individual Defendants' under 42 U.S.C. § 1983 for violating the Deceased's constitutional rights. Specifically, Plaintiffs' have alleged violations of the Deceased's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. [D. 1-1, ¶ 42, 46(a)–(c)].

#### a. Proper Constitutional Basis

When determining whether a constitutional right was violated, the Court "must first ascertain the source of that right." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). Plaintiffs' have alleged violations under the Fourth, Fifth, Eighth, and Fourteenth Amendments, but "[w]hich amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." *Id.* (citing *Gravely v. Madden*, 142 F.3d 345, 348–49 (6th Cir. 1998)). If the alleged violation occurs during an arrest or other seizure of an otherwise free person, the claim arises under the Fourth Amendment, which requires an objectively reasonable use of force. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). If the alleged violation occurs when the person is a convicted prisoner, the Eighth Amendment sets the standard, which is violated if the force was applied maliciously and sadistically rather than to

maintain or restore order in good faith. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). If the person is somewhere between the two, the standard is set by the more generally applicable Due Process Clause of the Fourteenth Amendment. *Id.*; *see also Richmond v. Huq*, 885 F.3d 928, 938 n. 3 (6th Cir. 2018).

Here, the Deceased was subjected to deadly force prior to the effectuation of an arrest, placing Plaintiffs' claims under the Fourth Amendment. *Tennessee v. Garner,* 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."); *see also Zulock v. Shures*, 441 F. App'x 294, 302 (6th Cir. 2010). Nevertheless, an "excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment." *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015)); *see also Richmond*, 885 F.3d at 938 n. 3. Consequently, regardless of where the Deceased's Fourth Amendment rights ebb and Fourteenth Amendment rights flow, the standard for excessive force is the same. *Clay*, 797 F.3d at 369.

### b. Qualified Immunity

Section 1983 provides a federal cause of action against state officials for the deprivation of constitutional rights under color of state law. But only certain defendants can be held liable for damages in a § 1983 suit. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Williams v. Godby*, 732 F. App'x 418, 420 (6th Cir. 2018). The plaintiff bears the ultimate burden

9

of proving that a defendant is *not* entitled to immunity. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

When determining whether a particular defendant is entitled to qualified immunity, the Court must decide (1) whether the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the defendant's alleged misconduct. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court may address these prongs in any order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and the Court will start with the question of whether the defendants violated a constitutional right.

The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat. *Graham*, 490 U.S. at 396. But the officer must act within the confines of the Fourth Amendment, and the force used must be reasonable. A court should take into account several factors to determine whether the officer behaved reasonably, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest. *Id.* (citing *Garner*, 471 U.S. at 8-9); *see Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) ("[T]he definition of reasonable force is partially dependent on the demeanor of the suspect") (quoting *Minchella v. Bauman*, 72 F. App'x 405, 408 (6th Cir. 2003)). Unlike the "typical" case, when, as here, deadly force is used, the Court must not simply consider the threat faced by the officer—the finding of a threat is a *minimum requirement* that must be met to find in the officer's favor. *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)) (emphasis added). And it cannot just be any threat: "Deadly force may only be used if the officer has probable cause to

10

believe that the suspect poses a threat of severe physical harm." *Id.* (quotation marks omitted). Moreover, the question of "whether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses *at that moment.*" *Gentry v. Cty. of Wayne*, 501 F. App'x 475, 477 (6th Cir. 2012) (quoting *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)) (emphasis added).

"When a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011) (citing *Estate of Sowards v. City of Trenton,* 125 F. App'x 31, 38 (6th Cir. 2005). As a result, a "police officer need not wait for a suspect to open fire on him, much less wait for the suspect to actually hit him, before the officer may fire back." *Id* (citing *Sowards,* 125 F. App'x at 38–39; *Boyd v. Baeppler,* 215 F.3d 594, 599–600 (6th Cir. 2000).

Here, the unfolding events began with a presumed violation of a protective order but escalated into a dangerous situation according to the unmet evidence presented by the Individual Defendants. The Deceased, who was armed and possibly suicidal, fled when officers reported to the scene of the violation, and the pursuit became a car chase. That car chase continued for roughly two hours, at times exceeding 100 miles per hour. The Deceased rebuffed attempts to negotiate a surrender plan and twice avoided spike strips deployed to end the car chase. When the Deceased's vehicle was finally stopped by Deputy Cameron, the Deceased emerged from his vehicle with his pistol pointed at his own head. After repeatedly ignoring instructions from the officers, the Deceased lowered his weapon in the direction of Deputy Cameron, prompting multiple officers to fire at him. While it is unclear who fired first, the unmet evidence indicates that the Deceased had pointed his pistol in the direction of Deputy Cameron. *See Boyd v. Baeppler,* 215 F.3d 594, 599–

11

600 (6th Cir. 2000) (holding that whether a victim actually fired at officers was "wholly immaterial," and the only question was whether he threatened to do so); *see also Wells v. City of Chattanooga*, No. 1:09-CV-219, 2011 WL 2749563, at *5 (E.D. Tenn. July 14, 2011) ("At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force." (quoting *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997)). The Deceased exited his vehicle facing away from several of the officers with his body "bladed" to Deputy Cameron at a 45-degree angle. Deputy Cameron stated that the Deceased lowered his pistol as he turned more towards him, at which point the officers fired, including the officers positioned behind the Deceased, and several shots struck the Deceased from behind.

To be sure, when officers shoot an individual in the back, there is cause for heightened constitutional scrutiny. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Zulock v. Shures*, 441 F. App'x 294, 297 (6th Cir. 2010). But, as the evidence stands, the officers were the only witnesses to the shooting, and all uniformly recount that the Deceased was directing his pistol towards Deputy Cameron. *See, e.g.*, *Chappell v. City of Cleveland*, 585 F.3d 901, 910–11 (6th Cir. 2009) (reversing district court's denial of qualified immunity where officers were the only witnesses to shooting and their testimony was uncontradicted). The Individual Defendants "were not required to have some split-second conferral amongst themselves to designate one Officer to fire." *Wells v. City of Chattanooga*, No. 1:09-CV-219, 2011 WL 2749563, at *5 n. 8 (E.D. Tenn. July 14, 2011).

After the initial shooting, the Deceased attempted to retrieve his dropped pistol, ignoring Officer Goins's instruction, "don't do it." As the Deceased reached for his gun, multiple officers fired again, and the Deceased died at the scene. Based on the unmet evidence before the Court, the Individual Defendants' conduct was objectively reasonable in the subsequent shooting as well.

12

"[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). Though it is unclear who shot first, the Deceased had already fired his weapon and was attempting to retrieve the firearm again. Based on the unmet evidence, it is not objectively unreasonable for the officers to have fired a second time.

The Court does note that the total number of shots fired at the Deceased—49—is an eyebrow-raising figure. Nevertheless, there were several officers involved in the shooting, and, again, "they were not required to have some split-second conferral amongst themselves to designate one Officer to fire." *Wells*, 2011 WL 2749563, at \*5 n. 8. Moreover, when the Deceased reached towards his pistol from the grounds, multiple officers fired another volley, again almost simultaneously. The Deceased was, in total, struck by 15 bullets. In short, the Court cannot conclude that the number of shots fired in aggregate renders the amount of lethal force inappropriately disproportional. *See id.* (citing *Baker v. City of Hamilton*, 471 F.3d 601, 607–08 (6th Cir. 2006)).

Lastly, the Court notes that Plaintiffs' claims are against the Individual Defendants in their individual and official capacities. However, an official-capacity claim is treated as a claim against the municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *see Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Peatross v. City of Memphis*, 818 F.3d 233, 240–41 (6th Cir. 2016). ("[A]n official-capacity claim against a person is essentially a claim against the municipality."). Accordingly, Plaintiffs' claim against the Individual Defendants in their official capacities will be dismissed for the reasons that the claim is dismissed against Hamilton County, as discussed *infra.*

In sum, the Individual Defendants have presented unrebutted evidence that establishes that the use of deadly force was objectively reasonable. Consequently, in absence of a constitutional

13

violation through the Individual Defendants' use of deadly force, qualified immunity serves as a shield of liability to Plaintiffs' claim under 42 U.S.C. § 1983.

### 2. State Law Claims

The Individual Defendants have also asserted various reasons why the Court should grant summary judgment regarding Plaintiffs' state law claims as well. However, there is a matter that must precede the Individual Defendants' arguments—jurisdiction.

Title 28 U.S.C. § 1367(a) provides that:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .

However, the district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it ha[d] original jurisdiction...." *Id.* at § (c)(3). The Sixth Circuit has instructed that in these circumstances, "[i]f the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Weser v. Goodson*, No. 20-5178, 2020 WL 3989633, at *8 (6th Cir. July 15, 2020) (quoting *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009)).

Here, the Court has dismissed Plaintiffs' federal claims against the Individual Defendants, over which the Court had original jurisdiction. Because the Court dismissed Plaintiffs' federal claims prior to trial, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, Plaintiffs' state law claims will be dismissed without prejudice. *See, e.g.*, *Jennings v. City of Lafollette*, No. 3:09-CV-72, 2010 WL 5173189, at *15 (E.D. Tenn. Dec. 14, 2010).

14

Case 1:18-cv-00017-PLR-CHS   Document 97   Filed 08/12/20   Page 14 of 18   PageID #: 1220

## B. Hamilton County's Motion for Summary Judgment

Hamilton County has also moved for summary judgment on all claims against it, arguing that no constitutional violation occurred, that, even if a violation occurred, no policy or practice of the Hamilton County Sheriffs Office caused the violation, and governmental immunity bars Plaintiffs' state law claims. The Court will first address Plaintiffs' § 1983 claim, then turn to the state law claims.

### 1. 42 U.S.C. § 1983

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). However, a local governmental unit may be liable for civil damages in a § 1983 action when the execution of a governmental policy or the toleration of a custom *causes* the deprivation of a constitutionally protected right. *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). At the core, regardless of the propriety of a governmental policy, "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cty.*, 205 F.3d 867, 879 (6th Cir. 2000)).

Here, the Court has concluded herein that Plaintiffs have not established that a constitutional violation has occurred, as set forth *supra*. Accordingly, Hamilton County cannot be liable under *Monell*. *See Robertson*, 753 F.3d at 622. Hamilton County's motion for summary judgment on this claim will be granted, and Plaintiffs' § 1983 claim against Hamilton County will be dismissed.

### 2. State Law Claims

Hamilton County also argues that it is entitled to summary judgment on Plaintiffs' state law claims for various reasons. As before, the jurisdictional question must be answered first.

Again, the Sixth Circuit has instructed that, "[i]f the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Weser v. Goodson*, No. 20-5178, 2020 WL 3989633, at *8 (6th Cir. July 15, 2020) (quoting *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009)).

Here, as with the Individual Defendants, the Court has dismissed Plaintiffs' federal claims against Hamilton County over which the Court had original jurisdiction. Because the Court dismissed Plaintiffs' federal claims prior to trial, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, Plaintiffs' state law claims against Hamilton County will also be dismissed without prejudice. *See, e.g.*, *Jennings*, 2010 WL 5173189, at *15 (E.D. Tenn. Dec. 14, 2010).

### C. Doe Defendants' Motion for Summary Judgment

The Doe Defendants have also moved for summary judgment, arguing that the deadline set by the Court for amending pleadings to add parties has passed and the statute of limitations has run.

A plaintiff may initially file a complaint against an unknown defendant using a "John Doe" appellation or similar pseudonym. *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *12 (E.D. Tenn. Nov. 4, 2009). However, simply identifying a John Doe defendant is not enough to commence the civil action against that defendant, nor does it intrinsically "stop the statute of limitations from running or toll the limitations period as to that defendant." *Nelkin v. Knox Cty.*, No. 3:14-CV-41-TAV-CCS, 2015 WL 2448320, at *9 (E.D. Tenn. May 20, 2015)

16

(citation omitted); *see Smith*, 2009 WL 3762961, at *12; *Bufalino v. Michigan Bell Tel. Co.*, 404 F.2d 1023, 1028 (6th Cir. 1968). In Tennessee, "civil actions for compensatory or punitive damages, or both, brought under the federal civil rights statutes" must commence "within one (1) year after the cause of action accrued." Tenn. Code Ann. § 28–3–104(a)(3); *Panzica v. Corr. Corp. of Am.*, 559 F. App'x 461, 463 (6th Cir. 2014); *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (citations omitted); *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005). In short, until the plaintiff amends the complaint to identify and join a John Doe defendant by his true name, the allegations are merely surplusage. *Brumlow v. Hamilton Cty.*, No. 1:16-CV-394, 2019 WL 613217, at *5 (E.D. Tenn. Feb. 13, 2019); *Pierce v. Hamblen Cty.*, No. 2:09-cv-34, 2009 WL 2996333, at *1 (E.D. Tenn. Aug. 17, 2009).

Here, Plaintiffs have not moved to amend the complaint under Rule 15, and the time for doing so has long since passed. [D. 11]. Further, Plaintiffs' have not presented a basis for tolling the one-year statute of limitations and suing a John Doe defendant does not intrinsically stop the clock.[3] *See Nelkin*, 2015 WL 2448320, at *9. The Deceased was tragically killed on January 17, 2017, meaning that the statute of limitations period has long since run. Consequently, the Doe Defendants' motion for summary judgment is granted, and Plaintiffs' claims against the Doe Defendants must be dismissed.

### D. Conclusion

In sum, based on the unrebutted evidence, qualified immunity shields the Individual Defendants from liability as to Plaintiffs' § 1983 claim. Likewise, Plaintiffs' failure to establish a

---

[3] Moreover, the extent of the tragedy giving rise to this suit does not provide a basis for tolling the statute of limitations in this case. *See Jones v. City of Franklin*, 677 F. App'x 279, 290 (6th Cir. 2017) ("[T]he Court is not permitted to allow sympathy to enter into its decisions on matters of law."); *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) ("Procedural requirements . . . for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.").

constitutional violation is fatal to Plaintiffs' § 1983 claim against Hamilton County. Because the federal claims against Hamilton County and the Individual Defendants will be dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and will dismiss these without prejudice. Plaintiff's failure to timely identify the Doe Defendants is fatal to all claims against the Doe Defendants. In short, all three motions for summary judgment will be granted.

## IV. Conclusion

In light of the foregoing, the Individual Defendants' motion for summary judgment [D. 61] will be **GRANTED.** Hamilton County's motion for summary judgment [D. 70] will be **GRANTED.** The Doe Defendants' motion for summary judgment [D. 72] will be **GRANTED.** An appropriate order will be contemporaneously entered.

_____
**CHIEF UNITED STATES DISTRICT JUDGE**